# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

CHIDI ONUKWUGHA,

      Plaintiff,

    v.                                    Case No. 11-CV-907

UNITED STATES OF AMERICA,

      Defendant.

## DECISION AND ORDER FOLLOWING COURT TRIAL

### I. INTRODUCTION

Chidi Onukwugha ("Onukwugha") operates Angel Food Market, a small corner grocery store in Milwaukee that was authorized to accept food stamps (now referred to as the Supplemental Nutrition Assistance Program ("SNAP")) until he was permanently disqualified from SNAP on August 30, 2011 for "trafficking." "Trafficking," is defined in the applicable regulations as a merchant accepting SNAP benefits "for cash or consideration other than eligible food," 7 C.F.R. § 271.2, although at issue here is only the provision barring the exchange of SNAP benefits for cash, (see Docket No. 33 at n.1). The Food and Nutrition Service ("FNS") of the United States Department of Agriculture ("USDA"), the agency that administers and supervises SNAP, determined that Angel Food Market was engaged in trafficking based upon a review of SNAP benefit redemption records. See 7 U.S.C. § 2021(a)(2) (authorizing disqualification based upon "evidence obtained through a transaction report under an electronic benefit transfer system"). Onukwugha challenged this determination administratively pursuant to 7 U.S.C. § 2023(a)(1), (3), and when this proved unsuccessful, he filed a civil action in this court pursuant to 7 U.S.C.

§ 2023(a)(13) and 7 C.F.R. § 279.7. (Docket No. 1.) All parties consented to the full jurisdiction of a magistrate judge, (Docket Nos. 2, 5), and a trial de novo was held on February 5, 2013 in accordance with 7 U.S.C. § 2023(a)(15). (Docket No. 31.) Following the trial, the parties each submitted briefs. (Docket Nos. 32, 33.) Based upon the evidence adduced at this trial and consideration of the parties' post-hearing submissions, the court concludes for the reasons set forth below that the plaintiff has failed to sustain his burden to show by a preponderance of the evidence that the agency's determination was invalid, Fells v. United States, 627 F.3d 1250, 1253 (7th Cir. 2010). Therefore, the court shall enter judgment in favor of the defendant.

## II. FACTS

Michael Skaer ("Skaer") was, during the investigation into Onukwugha, the official with FNS in charge of ensuring retailers' compliance with SNAP in the Midwest region; he has since been promoted. He testified that because the agency's enforcement staff is so small, it is generally not able to conduct investigations regarding merchant trafficking by obtaining direct evidence, e.g. sending an undercover agent or cooperating witness into a store and having that person exchange SNAP benefits for cash. Instead, it relies upon an automated analysis of electronic transaction records.

SNAP beneficiaries receive benefits electronically and utilize them by way of a card similar to a debit card. A set dollar value of benefits are deposited into the beneficiary's account on a certain date each month, and the beneficiary can then use those funds to buy qualifying groceries at participating retailers. While larger retailers might have integrated devices that will process credit, debit, and SNAP cards, smaller retailers, including Angel Food Market, are provided with a device dedicated to processing SNAP benefits. Because transactions are all processed electronically, it is easy for FNS to keep track each beneficiary's or each retailer's transactions.

FNS automatically monitors retailer transactions for patterns that it has determined are indicative of trafficking. During the time period between September 2010 and February 2011, Angel Food Market's transactions triggered suspicion for four reasons: (1) multiple transactions greater than $9.00 that end with the same numbers in the cents place; (2) multiple transactions on the same card within 24 hours totaling more than $100.00; (3) multiple transactions that reduce a card's balance by 90% or more within 24 hours; and (4) high dollar transactions, e.g. transactions greater than the average for a store of that type.

Based upon this suspicious transaction history, Skaer went to Angel Food Market on March 3, 2011. (Admin R., Ex. 1, at 16 (hereinafter (R.)).) On this visit, Skaer observed a store with moderate stock, and the most expensive item in the store was infant formula at $15 - $19 per can. Skaer also took photographs of the store. (R. 17-24.) The store is small with a total of four short aisles. (R. 12.) There was a very small counter area with the cash register set off from the store behind a security barrier. (R. 111.) There was no optical scanner and thus prices were manually input. (R. 111.) The store did not have a parking lot and did not offer customers shopping carts or baskets. Skaer spoke with Onukwugha who said he was the one who usually worked the register and denied rounding off purchases to zero.

Skaer never spoke to any of the beneficiaries identified as being involved in the suspicious transactions. Skaer testified that a household is issued a single benefits card, which then can be shared with anyone in the household or even friends or strangers. While the customer must enter a PIN to complete the transaction, a beneficiary can share this PIN with anyone.

Skaer compared the transaction history at Angel Food Market with Chuck's Smoke Shop, a nearby retailer authorized to accept SNAP benefits. Although the stores were of a similar size and had a similar total value of redemptions in the relevant period, the comparable store had very few of

3

the red flagged transactions that Skaer identified at Angel Food Market. However, Skaer's analysis was based upon only transaction records; he never visited the comparable store.

Following his visit, Skaer had another FNS employee, Sue Elle, prepare a report analyzing transactions at Angel Food Market. Elle concluded that there was no reasonable explanation for the large number of suspicious transactions other than trafficking. (R. 110-23.) Her report highlights a number of transactions the author found suspicious including:

- high value transactions (between $49.98 and $99.98) all ending in $0.98, (R. 112-13);

- a $20.00 transaction followed less than two minutes later by another for $99.89, (R. 113);

- households involved in very similar high value transactions within the same day, e.g. $99.89 and $99.85 for household ending 0566 on January 12, 2011; $99.89 and $99.68 for household ending 5583 on November 10, 2010; and $79.97 and $79.85 for household ending 1135 on September 8, 2010, (R. 114);

- transactions considered excessively large for the size of Angel Food Market, including 45 transactions greater than $99.00, (R. 115).

Skaer noted that while infant formula may be purchased with SNAP benefits, SNAP beneficiaries who purchase infant formula will generally also qualify for WIC benefits, which can be used for only a narrow class of products, including infant formula. Thus, infant formula is generally not purchased with SNAP benefits. Angel Food Market also accepted WIC benefits. (R. 111.)

Onukwugha testified and denied ever providing cash or ineligible products for SNAP benefits. Customers have asked for cash back from a SNAP transaction, but he has refused. He testified that he is familiar with many of his customers and knows that it is common for many members of a family to use a single card. For example, one family member might come in at one time and make a small purchase and later that same day another family member will come in and make a large purchase. Onukwugha identified infant formula as the most expensive item in his store

4

but said that cases of orange juice at $14 per case and large packages of chicken for $8.99 were other high value items he sold. Hot Pockets, which he said he purchased from Aldi's, were also very popular at $4.99 or $5.99.

On cross-examination, Onukwugha acknowledged that in the first three months of 2011, he had more than $32,000 in SNAP redemptions but for tax purposes reported only about $22,000 in total sales and less than $19,000 in exempt food sales during the same period. He offered no explanation for this discrepancy.

Alan Sheil is a compliance manager for the WIC program in Wisconsin, and as part of these duties he has visited and reviewed WIC transactions for Angel Food Market. He testified that he did not detect anything suspicious with respect to Angel Food Market's transactions. Although he had visited Angel Food Market five times, he did not visit the store during the six month period covered in the FNS investigation; in fact, he was not there at all in 2010 or 2011.

One of Onukwugha's customers, Ernest Jones ("Jones"), testified that he lives right across the street from Angel Food Market and uses the store regularly—as often as four to five times a day between himself and his family. He stated he will use about $200 of his SNAP benefits at Angel Food Market every month and has never obtained cash, tobacco, or alcohol with SNAP benefits. Nor has he seen any other customer obtain cash, tobacco, or alcohol with SNAP benefits at Angel Food Market. He noted that he liked shopping at Angel Food Market because Onukwugha would occasionally let him make purchases on "credit" meaning that he would obtain merchandise and then come back to the store later with his SNAP card and Onukwugha would charge the card at that time. However, this extension of "credit" is barred by SNAP rules and Onukwugha testified he knew this. Thus, Onukwugha testified he could not remember ever extending "credit" on SNAP benefits but stated that he would offer credit only on cash transactions.

The court also received the depositions of three of Onukwugha's other customers under Fed. R. Civ. P. 32(a)(4)(D) after these witnesses failed to honor the subpoenas that the plaintiff served upon them to testify at trial. (Exs. 101, 102, 103.)

Sharon Mosley ("Mosley") testified she lives two houses away from Angel Food Market and stated that she was "trying to help [Onukwugha] keep his store" because she would not be able to walk to any other grocery store. (Ex. 101 at 21-22, 56.) She never obtained cash for SNAP benefits and considered it "very impossible" for Onukwugha to do that for anyone else. (Ex. 101 at 55.)

She stated she does most of her grocery shopping at Angel Food Market where she buys mostly "junk," (Ex. 101 at 17), but her SNAP card is shared amongst various household members and sometimes someone else will use it at a full-line grocery store. (Ex. 101 at 8-20.) Mosley testified that she might go to Angel Food Market an average of 20 times a day, always purchasing food and always using SNAP benefits to pay. (Ex. 101 at 22-23.) While there were days where she made multiple trips to Angel Food Market, the transaction records appended to her deposition indicate these multiple visits occurred only on isolated days shortly after her benefits were deposited and the greatest number of transactions on a single day was four on both January and March 12, 2011. (Ex. 101 at Ex. 13; see also R. 55.) When questioned about this discrepancy, Mosley testified that she will usually use the full monthly balance in one day shortly after it is deposited. (Ex. 101 at 52.) Thus, she acknowledged there would be periods of nearly a full month where her balance was depleted and therefore she had no benefits remaining to utilize. (Ex. 101 at 53-54.)

Mosley said the largest purchase she ever made at Angel Food Market was one or two hundred dollars. (Ex. 101 at 28-29.) In the period covered by the transaction records provided to the court, the largest transaction at Angel Food Market was $99.89 on January 13, 2011. (Ex. 101 at Ex. 13; see also R. 55.) When questioned about her transactions on January 13, 2011 she could offer no

6

explanation as to why her SNAP card had a transaction for $6.00 at Angel Food Market and then two-and-a-half minutes later had another transaction for $99.89. (Ex. 101 at 42-43.) She stated she had no recollection of this transaction and could offer no explanation other than to speculate that she might have gone back to make a second purchase. (Ex. 101 at 43.) She stated that Onukwugha may take about 10 minutes to process a $100 transaction. (Ex. 101 at 31-32.)

She was also questioned about a series of transactions on February 12, 2011 where her card was used at a different local grocery store for $120 and then four minutes later it was used for $29.98 at Angel Food Market. (Ex. 101 at 45-46.) Mosley testified that she recalled this date and said she had been with her sister at the other grocery store and once they got home, her daughter asked for her card and went to Angel Food Market. (Ex. 101 at 46-48.) That same day, the card was used at another grocery store for $122 and then back to the first grocery store for another $62. (Ex. 101 at 51.)

Christopher McGowan ("McGowan") similarly testified that he would do much of his grocery shopping at Angel Food Market because it was so close to his home. (Ex. 102 at 10.) He acknowledged making large purchases at the store, and sometimes many transactions in a single day. (Ex. 102 at 23-24.) However, he could offer no explanation as to why on October 6, 2010, he made a series of small purchases throughout the day but then in the evening made a purchase of $49.98 and then eight minutes later another purchase again for $49.98 other than to state he must have gone home and then come back and made another purchase. (Ex. 102 at 26-27; see also Ex. 102 at Ex. 29, R. 95.) He denied ever exchanging SNAP benefits for cash. (Ex. 102 at 28.)

Otha Pierce ("Pierce") testified that he also lives nearby Angel Food Market and was cooperating with this case because he wants Angel Food Market to be able to accept food stamps again because it is so convenient. (Ex. 103 at 9-10.) Although Angel Food Market might have higher prices, Pierce said he likes to shop there because he believes it is important to support

businesses in his community. (Ex. 103 at 30-32.) Also, he appreciates that Onukwugha would occasionally pay him for odd jobs at his store. (Ex. 103 at 32-34.)

When questioned about his transactions on September 11, 2010 where he made a purchase of $40.00, another purchase for $42.00 an hour-and-a-half later, and then $41.00 two hours later, and finally $40.50 an hour and forty minutes later, Pierce said he could not remember that day and so speculated he might have made a series of purchases because he could not carry everything in one trip. (Ex. 103 at 15-16; see also Ex. 103 at Ex. 15, R. 122.) A month later Pierce had a similar series of transactions where he made a purchase of $41.00, then an hour later another $41.00, and the following day again $41.00. (Ex. 103 at 19-20.)

### III. ANALYSIS

Under the applicable law, at this stage of the proceedings, a store owner such as Onukwugha is required to essentially prove his innocence. Fells v. United States, 2010 U.S. Dist. LEXIS 4806, 14 (E.D. Wis. Jan. 5, 2010). This inherently difficult task is compounded by the nature of the government's allegations. The government does not allege that every flagged transaction was an incident of trafficking; in fact, it seems to concede that some suspicious transactions were innocent. Thus, proving his innocence is not as simple as Onukwugha providing an appropriate explanation for a particular transaction. Instead, the government argues that it is the pattern—the sheer number of suspicious transactions—that proves trafficking must be occurring. Therefore, the burden is on Onukwugha to prove by a preponderance of the evidence that this pattern of suspicious transactions is not the result of trafficking.

This does not necessarily require Onukwugha to produce a detailed explanation as to the facts and circumstances of every transaction. Instead, a single business practice might explain away an entire class of suspicious transactions. For example, if the FNS found it suspicious that a store

8
Case 2:11-cv-00907-AEG   Filed 04/12/13   Page 8 of 17   Document 34

owner had a large number of transactions for exactly $49.98, this suspicion might be dispelled if the owner produced evidence that he routinely sold cases of meat for $49.98.

The FNS' conclusion that Onukwugha engaged in trafficking is based upon four categories of suspicious transactions between September 2010 and February 2011:

- Unusual number of transactions ending in the same cents value, (R. 126-36);
- Multiple transactions in an unusually short time, (R. 137-47);
- Excessively large transactions, (R. 148-53);
- Benefits being exhausted in a short period of time, (R. 155-57).

(R. 124.) Skaer testified that the transactions in these categories at Angel Food Market were anomalous when compared with Chuck's Smoke Shop. However, Skaer never visited Chuck's and instead based his conclusion that the stores were comparable based upon an analysis of transaction data. (See R. 73-74; 116-18.) When asked if he knew if Chuck's sold food, Skaer responded only that it must because it was authorized to accept SNAP. Although there is within the record a report from another FNS employee regarding a visit to Chuck's, Skaer did not testify that he relied upon this report, and in any event, the report was roughly four years old and therefore of little probative value as to the status of Chuck's during the relevant period. Simply because two stores are classified as small grocery stores and have similar transaction histories does not mean they are comparable with respect to the criteria Skaer used to for comparison. For example, if Chuck's Smoke Shop's selection of groceries is not as full as Angel Food Market's (a reasonable inference based upon the businesses' names), it would not be unreasonable to expect that more customers would use Angel Food Market as a primary grocery store and thus make larger purchases at that store. In the absence of better evidence that the stores were, in fact, comparable with respect to relevant criteria, the court shall disregard the conclusions that FNS made based upon a perceived comparison. Therefore, instead of considering whether Angel Food Market's transactions are suspicious when compared to

Chuck's Smoke Shop, the court analyzes the above-referenced categories for objectively suspicious transactions.

### A. Excessively Large Transactions

The court begins with the excessively large transactions. FNS identified 309 transactions totaling nearly $20,000 that were $40.00 or greater. (R. 148-53.) While Angel Food Market is small, it is well-stocked and offers a relatively wide selection of groceries. Thus, it is reasonable that nearby residents without ready access to a larger full-line grocery store, such as those who testified on Onukwugha's behalf, will do much of their grocery shopping at Angel Food Market and therefore may be reasonably expected to spend more than $40.00 in a single trip. Although the absence of shopping carts, an optical scanner, or substantial counter space will undoubtedly complicate a large purchase, the testimony of Onukwugha's customers made clear that shoppers will bear this inconvenience in the absence of a better alternative. A review of the 309 transactions demonstrates that many of the transactions are those of just a few households. In fact, based upon the court's review, 271 of the 309 transactions are from households who made more than one purchase of greater than $40.00 at Angel Food Market during the relevant six-month period. While this is arguably consistent with a few customers repeatedly exchanging their SNAP benefits for cash, the more reasonable and logical explanation is the innocent one—certain customers simply choose to do a large portion of their shopping at Angel Food Market.

### B. Multiple Transactions and Exhaustion of Benefits in an Unusually Short Time

The conclusion that certain customers will choose to do much of their shopping at Angel Food Market also offers some explanation for the fact that certain beneficiaries will exhaust their benefits in a relatively short period of time. As Mosley explained, it is her habit to do a month's worth of grocery shopping at Angel Food Market soon after her benefits arrive. The fact that Angel Food Market does not have shopping carts, ample counter space by its register, or an optical scanner

10

might, when combined with the fact that its customers generally live nearby and travel to the store on foot, explain why there are a number of sizable transactions in close proximity. McGowan, Mosley, and Pierce all testified that they will purchase as much as they can carry, bring that purchase home, and then return to Angel Food Market to make another purchase. Or as these witnesses also testified, the convenience of Angel Food Market enables them and their family members to make a number of small trips to the store throughout the day whenever they want something.

These purchasing habits may answer some of the FNS' suspicions regarding multiple transactions in an unusually short time. FNS identified transactions totaling more than $100.00 "made from individual benefit accounts in unusually short time frames" as being indicative of trafficking. (R. 137-47.) FNS identified 271 individual "violations" consisting of 76 separate sets of transactions involving 49 different households which totaled more than $10,000.00. However, it is important to note that FNS considers up to 24 hours to be an "unusually short time period." (R. 137-47.) The court does not regard multiple transactions occurring over the span of hours to be inherently suspicious. As was made clear by the testimony of Onukwugha's customers, with various members of a household sharing a single card, it is not uncommon to make multiple trips to Angel Food Market on a given day.

Only seven sets of transactions (16 total transactions) involve a span of less than an hour, a time period the court regards as more plausibly consistent with evidence of trafficking. (R. 137.) Of these seven, five involve a large purchase in the $98-$100 range followed by one other transaction of $2.29 or less in close proximity. It is unclear why the FNS regards this pattern of transactions as consistent with trafficking rather than the innocent explanation of a shopper realizing he forgot something or, for example, one household member wanting to make a small purchase and be on her way while the other household member stays behind to complete a larger purchase. In any event,

11

five transactions over a span of six months is not, in the court's view, especially probative of a pattern of trafficking.

However, there are two sets of transactions of this subset that the court regards as particularly suspicious. In the first, on November 11, 2010, household number 3611 made four purchases within 19 minutes for $4.00, $1.50, $14.00, and then $98.87. This seems odd and no innocent reason has been proffered. The second occurred on January 10, 2011, when household number 2015 made a purchase for $100.09 and then less than eight minutes later made a second large purchase of $82.09. (R. 137.) This span of time is not consistent with a customer making a purchase, returning home, and then returning to make a second purchase. But while this transaction does not appear to fit within the ambit of an innocent transaction, trafficking is not the only logical inference. For example, this might be a customer settling-up a prior extension of credit, consistent with Jones' testimony. While extending no-interest credit might be a violation of SNAP rules, it would not constitute trafficking. However, Onukwugha denied ever extending credit based upon SNAP benefits and thus the court is unable to conclude that this is the explanation for this transaction. It is problematic that no innocent explanation for these transactions has been provided. Notwithstanding, the court is reluctant to conclude that based on these two sets of large transactions occurring within a narrow time frame Onukwugha engaged in trafficking; more of a pattern is certainly required.

That pattern is found when looking closer at the sets of transactions that span more than an hour. Although the series of three or more transactions may stretch out over many hours, there are instances where two or more transactions occur in quick succession without any apparent rational explanation. For example, on October 6, 2010, household number 2151 made a purchase for $49.98 and then about eight minutes later made a second transaction for the exact same amount. (R. 145.) On the evening of October 11, 2010, household number 2445 made two transactions within an hour,

12

each for exactly $41.00, followed by another transaction for the same amount the following evening. (R. 144.) On January 3, 2011, household number 2269 made a $49.98 purchase at noon, followed by another $49.98 purchase at 3:24 PM and another $48.99 purchase at 4:29 PM. (R. 139.) Finally, household number 4335 made one transaction for $2.50 on January 13, 2011 and less than a minute later made another for $50.98. (R. 139.)

Transactions occurring in relatively quick succession, especially transactions that are large and for identical amounts, are extremely suspicious. Onukwugha has not offered any explanation for these transactions and neither have his customers who were involved in certain of these suspicious transactions, (see Ex. 101 at 42-43; Ex. 102 at 26-27; Ex. 102 at 15-16). In the absence of an innocent explanation, the court must conclude that Onukwugha has failed in his burden to prove that these transactions were not the result of trafficking.

### C. Transactions Ending in the Same Cents Value

As for the large number of transactions ending in even or half-dollar amounts, rounding is one logical explanation. But Onukwugha denied ever rounding transactions. Alternatively, transactions ending in even or half-dollar amounts, even large transactions, might be plausibly explained if a retailer had a practice of pricing items in even or half-dollar amounts including promotional pricing such as "3 for $1." In the absence of sales tax on most food purchases, see Wis. Adm. Code Tax § 11.51, this pricing strategy is likely to result in a large number of transactions ending in even or half-dollar amounts. And Onukwugha did engage in this sort of even dollar pricing to some degree. But he also priced items ending in $0.99 such as his chicken for $8.99 or his very popular Hot Pockets for $4.99 or $5.99. Even a store that prices many items in even or half-dollar amount, the larger the transaction, the less likely it is that the final total will end in an even or half-dollar, especially when considering that soda and candy are subject to sales tax, see Wis. Adm. Code Tax § 11.51.

13

Case 2:11-cv-00907-AEG   Filed 04/12/13   Page 13 of 17   Document 34

But even if pricing and sales tax could be expected to lead to essentially random outcomes with respect to the numbers in the cents place of any transaction (a scenario that becomes more likely with larger transactions), statistically two percent of transactions could still be expected to end in either even or half-dollar amounts. Of the 211 transactions FNS identified as being for $50.00 or greater, 50 of these transactions (24%) ended in either even or half-dollar amounts. (R. 148-52.) This statistically anomalous result warrants an explanation, but in the absence of any reasonable explanation, the court must conclude that Onukwugha has failed in his burden to prove that this is not the result of trafficking.

A bigger red flag in the court's view is the 100 transactions ending in $0.98. (R. 134-36.) These transactions cannot be readily explained with any single pricing strategy. Unlike with even or half-dollar pricing where even the largest purchase of tax-exempt products made up solely of items ending in an even or half-dollar will result in a final transaction total ending in either an even or half-dollar, there is no pricing strategy that is likely to end with final totals in larger transactions disproportionately ending in $0.98. Of the 211 transactions of $50.00 or greater, 37 (17.5%) end in $0.98, (R. 148-52), which again appears to be a statistical anomaly.

Another notable statistical anomaly emerges when looking solely to transactions of greater than $99.00 but less than $100.00. Of these 36 transactions that fit this category (a quantity of transactions that is itself statistically anomalous in that it represents 17% of all transactions between $50.00 and $117.00), there are three transactions for $99.98 (8%), three for $99.97 (8%), ten for $99.89 (28%), ten for $99.87 (28%), three for $99.86 (8%), two for $99.85 (6%), and two for $99.78 (6%). There are only three transactions (8%) for other amounts. No reasonable explanation has been provided to account for the fact that 56% of all ninety-nine dollar transactions would be for either $99.97 or $99.89.

14
Case 2:11-cv-00907-AEG   Filed 04/12/13   Page 14 of 17   Document 34

All of these anomalous outcomes could not be reasonably expected absent some manner of manipulation by Onukwugha. In the absence of any other plausible explanation, the court cannot conclude that Onukwugha has proven by a preponderance of the evidence that these transactions were not the result of trafficking.

**D. Other Facts Consistent with Trafficking**

In addition to the transaction data discussed above, various other facts support the conclusion that Onukwugha engaged in trafficking. Most significant is the fact that after Onukwugha was notified of the FNS' investigation, his SNAP redemptions immediately dropped precipitously. Onukwugha was notified of the FNS' investigation by way of a letter dated April 26, 2011. (R. 124.) In the month that followed, during which Onukwugha remained eligible to accept SNAP benefits, redemptions at Angel Food Market dropped from an average of about $11,000.00 per month for the ten months prior, to just over $6,000.00. (R. 170.) Onukwugha has offered no explanation for this significant drop, and a reasonable inference is that after recognizing the investigation, Onukwugha immediately ceased exchanging SNAP benefits for cash, thus resulting in the drop in redemptions at Angel Food Market.

Additionally, there is the fact that the sales that Onukwugha reported to the Wisconsin Department of Revenue for sales tax purposes were grossly inconsistent with his SNAP redemptions. Onukwugha reported total sales of $22,435.28 and tax exempt sales of $18,846.49 to the Wisconsin Department of Revenue for the first quarter of 2011. (Ex. 61.) However, his total SNAP redemptions during this same period were $ 32,482.49. (R. 170.) Even if every purchase at Angel Food Market was an eligible SNAP purchase (and thus Angel Food Market sold no beer, cigarettes, or even paper plates) during this period, and every customer purchased with SNAP benefits (and thus Angel Food Market never had a transaction involving cash, credit card, or debit

15

card), there would still be more than $10,000.00 in unaccounted for SNAP redemptions. This fact is highly probative of trafficking.

## IV. CONCLUSION

Onukwugha has offered evidence that explains certain of the suspicious transactions identified by the FNS. For example, customers without ready access to a larger grocery store choose to do the bulk of their grocery shopping at Angel Food Market. Some of these customers will purchase only as much as they can carry home and then return to the store to complete their shopping, leading to a number of sizable transactions within a relatively short period of time. And some of these customers will do a month's worth of grocery shopping in one day, thus exhausting their benefits quickly. However, Onukwugha has failed to offer an innocent explanation for other anomalous transactions including why households made large transactions for the same or nearly the same dollar amount in quick succession or why there were so many transactions ending in the same cents value. Moreover, Onukwugha has offered no explanation for the glaring discrepancy between his SNAP redemptions and the sales he reported to the Wisconsin Department of Revenue or for the marked drop in SNAP redemptions once he was notified of the FNS' investigation. These facts are highly probative of trafficking. Therefore, analyzing the totality of the evidence presented, the court concludes that the Onukwugha has failed to sustain his burden to show that Angel Food Market was not engaged in trafficking.

As for FNS' decision to permanently disqualify Onukwugha from participating in SNAP, Onukwugha argues that in absence of any direct evidence that he engaged in trafficking, e.g. an undercover sting or an admission by one of Onukwugha's customers, a permanent revocation is unnecessarily severe and "cold hearted," especially considering it may ultimately result in the loss of his business. (Docket No. 32 at 4.)

A retailer that seeks the imposition of a monetary penalty in lieu of permanent disqualification must promptly present evidence to the FNS of the firm's eligibility for a monetary penalty. 7 C.F.R. § 278.6(b)(2)(ii). Criteria necessary to be eligible for a monetary penalty are set forth in 7 C.F.R.§ 278.6(i) and include a requirement that the owner of the store was not involved in and did not benefit from the trafficking. As the owner of Angel Food Market and the person who worked the register nearly all the time, Onukwugha would not appear to be eligible for a monetary penalty. And in any event, Onukwugha has not presented evidence that he complied with 7 C.F.R. § 278.6(b)(2)(ii) in requesting a monetary penalty or that he is, in fact, eligible for a monetary penalty under 7 C.F.R.§ 278.6(i). Therefore, the court must enter judgment in favor of the defendant affirming the FNS' permanent disqualification of Onukwugha from participation in the SNAP program.

**IT IS THEREFORE ORDERED** that the Clerk shall enter judgment in favor of the defendant, the United States of America, and against the plaintiff, Chidi Onukwugha.

Dated at Milwaukee, Wisconsin this 12th day of April, 2013.

AARON E. GOODSTEIN
U.S. Magistrate Judge